[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Richard Mute, has appealed the denial by the Litchfield Conservation Commission's ("commission") of a permit application of the plaintiff to develop a previously approved subdivision of some fifth-four acres, more or less, located at the juncture of Deming Road and the Norfolk Turnpike. Rec. at Ex. 95.[1]
On June 4, 1997, the plaintiff applied to the Litchfield Conservation Commission for approval of regulated activities within wetlands regulated areas related to a fifteen (15) lot subdivision proposal. (R. Items 1.a., and 1.b.). The parcel consists of 54.41 acres in an R-80 zone (2 acres) and is shown as Lot 58, Block 35 on Assessors Map 160. (R. Items 1.a., and 1.b.)
During the course of the hearing process, the applicant modified the application by eliminating one lot, changing the original proposed stream crossing method from a closed bob culvert to an open box culvert, and modified storm water runoff control from within the wetlands area to two detention ponds outside the wetlands area, but still within the 100' regulated buffer area from the wetlands boundary. (R. Item 97, Transcript pg. 84, lines 3581-3589; pg. 85 line 3623; pg. 85 lines 3652-3653; pg. 111 lines 4736-4769). Also, during the course of the hearing process, the interveners Alan Organschi and Carola B. Organschi submitted for the Commission's consideration a proposed feasible and prudent alternative 6 lot subdivision. (R. Items 83, 85a, 85b). That proposed feasible and prudent alternative reduced the impact on wetlands by reducing the length of the 2400 foot long and 22 foot wide paved public road proposed by the applicant, to a 1400 foot long, 18 foot wide gravel common driveway which is smaller and not as impervious a surface. (R. Item 97 Transcript pg. 69 lines 2956-2967; pg. 70-71 lines 3008-3015: pg. 80-81 lines, 3419-3450: Items 83, 35a, 85b).
The plaintiff chose to maintain the application as amended at 14 lots and was not willing to offer an alternative six lot subdivision as a feasible and prudent alternative, or for that matter any other feasible and prudent alterative regardless of CT Page 9374 the number of lots.
At the October 22, 1997 meeting, the commission denied the 14 lot plan after finding that "the proposed activities to constitute a significant activity per Section 2.1 of the Town of Litchfield Conservation Commission Inland Wetlands and Watercourses Regulations". The Commission determined in its reasons for denial that "at least one feasible and prudent alternative exists" and further determined that "Alternatives included a 6 lot subdivision. with a 18' wide gravel common driveway which would cause less environmental impact to the wetlands and watercourses". It also found that "fewer lots would-reduce the amount of impervious surface and minimize impacts to wildlife due to forest fragmentation", that "a less intensive development would reduce the amount of storm water runoff-and may result in a wet storm water detention pond that could be located further away from a wetlands or watercourses, and in turn. decrease the area of disturbance necessary to create the detention basins." Last, it determined that an arch culvert or bridge as opposed to an open — bottom box-culvert represents a feasible and prudent alternative which may minimize impact on wetlands and wildlife by requiring less fill and in better facilitating wildlife travel." (R. Items 93 and 94 pg. 9-10).
The plaintiff is the owner of the land which is the subject of the wetlands applications and the applicant before the Commission. As an owner of the property and the applicant, the plaintiff is aggrieved by the Commission's decision to deny him approvals under the regulations. Winchester Woods Associates v.Planning and Zoning Commission of Town of Madison, 219 Conn. 303,308 (1991); Bossert Corporation v. Norwalk, 157 Conn. 279, 285
(1968); D.S. Associates v. Planning Zoning Commission,27 Conn. App. 508 (1992). The plaintiff reserves the right to submit evidence outside of the record at trial to establish aggrievement in accordance with Connecticut General Statutes § 8-8(k).
An administrative agency determines the applicability of the law to a specific set of facts. The role of a court on review is to judge whether the decision was unreasonable, arbitrary or illegal. Caserta v. Zoning Board of Appeals, 28 Conn. App. 256,258 (1992). In reviewing decisions by a wetlands agency, the trial court must sustain the agency's final decision if an examination of the record discloses evidence that supports any one of the reasons given for its action. Huck v. Inland WetlandsAgency, 203 Conn. 525, 539-40 (1987). The evidence to support any CT Page 9375 such reason must be substantial. Id. at 540.
It is the burden of the plaintiff challenging the administrative action to establish that the record does not support the action of the agency. Red Hill Coalition. Inc. v.Conservation Commission. 212 Conn. 710, 718 (1989); Laufer v.Conservation Commission, 24 Conn. App. 708, 715 (1991). Our Supreme Court has stated that:
 [t]he plaintiff must do more than simply show that another decision maker, such as the trial court. might have reached a different conclusion. Rather than asking the reviewing court to retry, the case de novo; Calandro v. Zoning Commission, 176 Conn. 439, 440 408 A.2d 229 (1979); the plaintiff must establish that substantial evidence does not exist in the record as a whole to support the agency's decision. Feinson v. Conservation Commission, 180 Conn. 421, 425, 429 A.2d 910 (1980).
Samperi v. Inland Wetlands Agency, 226 Conn. 579, 587 (1993).
In evaluating whether the conclusions reached are supported by application of the substantial evidence standard. determinations of fact are matters within the province of the wetlands agency. Huck, 203 Conn. at 542. The agency is not required to use the evidence and materials presented to it in any particular fashion, so long as the conduct of the hearing is fundamentally fair. Bradley v. Inland Wetlands Agency,28 Conn. App. 54 (1992).
Plaintiff claims that in this case the commission erred in denying the sought for permit to conduct regulated activities. because it found that a feasible and prudent alterative existed to the proposal of the applicant. Specifically, the commission set forth four arguments why a smaller development would lessen the impacts upon wetlands on the site. See Plaintiff's Brief at 17; Rec. at Ex. 95. Plaintiff argues that (1) the commission was without jurisdiction to consider several of the topics that arguably influenced its decision; (2) even assuming, argued, that the commission had such jurisdiction there is not substantial evidence upon this record to support is decision; and (3) that the commission could not deny the permit application based upon the bar existence of a feasible and prudent alternative.
The burden is on the Plaintiff to prove that the Conservation CT Page 9376 Commission acted illegally or arbitrarily, or that its decision was not supported by the evidence in the record. Huck v. InlandWetlands Watercourses Agency, 203, Conn. 525, 553. "The Agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons [for denial] given." Huck, supra at 540 (and the cases cited therein). An examination of the record discloses substantial evidence to support the reasons given after the Commission determined that the proposed activities[2] (R. Items 93 and 94) listed constituted a significant activity.
a.) First Reason:
 "Per Section 10.3(a) the above application received a public hearing pursuant to a finding by the Conservation Commission that the proposed activity may have a significant impact on wetlands and watercourses. Based on that determination, the Commission cannot grant a permit unless the agency finds on the basis of the record that a feasible and prudent alterative does not exist. Based on testimony heard during the public hearings, at least one feasible and prudent alterative exists. [Reasons 2-5 have been removed from this quotation] NOW THEREFORE BE IT FURTHER RESOLVED BY THE Litchfield Conservation Commission that the application of Richard Mute be denied on the basis of finding that there may be feasible and prudent alterative to the proposed regulated activities which have less adverse impact on wetlands and watercourses. The types of alternatives which Mr. Mute may investigate include:
 1. A less intensive development such as a 6 lot resubdivision utilizing an 18' gravel common driveway.
 2. Installation of a bridge or arch culvert in the area of the stream crossing to minimize impacts on wildlife travel and reduce the amount and the height of fill required in the area of the wetlands crossing.
 3. Reducing the length of the proposed Litchfield Hollow Road thereby reducing the size and/or relocating the two storm water detention basins, further reducing the environmental impact on the wetlands and/or watercourses on the property.
 4. Proposing fewer lots would result in less intense use of the property and allow placement of the dwellings, driveways, septic systems and footing drains further from regulated CT Page 9377 wetlands areas."
A partial listing of the evidence in support is as follows: — Plaintiff's Engineer, Dennis McMorrow stated "the road crossing [of the wetlands] is. 11 acres of direct impact on the wetlands" (R. Item 97 Transcript pg. 3 line 106).
 — Attorney Perley Grimes for the interveners stated "it is a sensitive area because of high ground water. It's also a sensitive area because there are fingers of wetland that go all through this parcel of land-" (Id. pg. 13 lines 525-527)
 — Commission member Blazek stated "Well I noticed this morning that stream up to about 4 miles-" (R. Item 97 Transcript pg. 164 lines 7050-7051)
 — Tom Daly, Engineer for intervener Alan Organschi stated, in relation to high ground water, "And why is this a wetlands issue, its because the septic obviously the ground water affect how a septic system works and we just want to be assured-especially in the vicinity of these wetlands and the Bantam River, that the septic systems are going to work as good as they can." (Id. pg. 27 lines 1153-1157). "The alternate. alternate design of 6 lots along a 1200 foot common driveway will have a significantly lesser impact on the adjacent wetlands — The 6 lot design will result in less impervious areas, septic systems, clearing it, clearing out of existing vegetation which would result in a more protection of adjacent wetlands and watercourses. The decreased amount to pavement area would result in reduction of the size of sediment basin and the amount of pollutants flowing into the watercourses. — This alterative [6 lots] clearly reduces the adverse impact on the wetlands and watercourses while still giving the applicant the ability to develop a parcel of land". (Id. pgs. 80-81 lines 3436-3450).
 — Edward Pawlak, wetlands scientist for intervener Alan Organschi concluded in his report "The red maple swamp on the property provides valuable wildlife habitat, which will be fragmented and impacted by the project" (R. Item 21 pg. 4). "The principal Litchfield Hollow Road crossing will impact a valuable wildlife travel corridor" [the stream]" (pg. 5). "The detention and discharge of storm water from the developed site will degrade on-site and off-site wetlands and watercourses. The project CT Page 9378 does not include BMP's [Best Management Practices] to avoid these impacts". (Pg. 7) "The applicant should consider alternatives that reduce the amount of land clearing and impervious surface in order to lesson impacts to wildlife and water quality." (Pg. 11 )
Finally, he stated "It is my professional opinion that this application should be denied in consideration of items 10.2a-g" (pg. 12) [the Regulation Standards and Criteria for reviewing an application]. Mr. Pawlak stated "With respect to crossing the wetland and stream in this area in order to allow fish passage and wildlife movement — the recommendation was for the utilization of either a bridge or a precast arch culvert. That recomrnendation came from the DEP publication the inland wetland commission s guide to site plan review." (R. Item 97 Transcript pg. 109 lines 4666-4670; R. Item 63, pg. 1).
"What this publication is saving is that the box culvert is not the method to use if you want to allow wildlife passage". (R. Item 97 Transcript pg. 109 lines 4680-4681).
Mr. Pawlak's testimony in relation to runoff from the paved road versus the feasible and prudent alternative of a common driveway is stated as follows "We have direct impacts [on the wetlands] such as filling" [Id. Pg. 183 lines 7859]. "The downsized project which is allowed in the P Z regs, and a common driveway serving 6 lots would reduce the amount of number 1, pollutants coming from this site, -it would increase the infiltration in base flood? and if you used, crossed with the arched culvert it would not impair wildlife movement". (Id. lines 7864-7869; R. Item 63 pg. 2).
And in explaining the "Schuller" publication on effects of impervious surfaces such as the proposed paved road, he stated "What this publication says with its data is that you have a incremental increase in these impacts as you increase the impervious surface in a watershed — as you add impervious surface, your stream temperature increases — You have a line which shows the degradation and the water quality as you increase your imperviousness. Going up to 5% already puts you-down into the fair range". (R. Item 97 Transcript pg. 184 lines 7890-7901).
Secondly, you don't want to create a pond in these areas [within 100' of wetlands], because that water will heat up, the next storm that comes through, you will have a thermal-down CT Page 9379 into a cold water stream. So you don't want to have — standing water there. You can achieve that away from the wetlands." (Id. pg. 185 lines 7913-7917).
b.) Second Reason:
The second reason for denial was that a feasible and prudent alternative consisting of a 6 lot subdivision with "an 18' gravel surface common driveway will significantly reduce the amount of impervious surface, thereby decreasing potential impacts to the streams and wetlands on the property. The feasible and prudent alternative reduces the amount of impervious surface, and its potential impact on stream water quality and in stream habitat." (R. Items 93 and 94).
The testimony recited to above for the first reason for denial amply supports the second reason, and in particular the testimony of engineer Tom Daly compares the 2450 foot long and 22 foot wide paved road to a 1200 long and 18 foot wide gravel driveway which would result in approximately 33,100 square feet an area equal to a 200 x 140 parking lot, less pavement area than a 22 foot roadway. The decreased pavement area would result in reduction in size of the sediment basin and the amount of pollutants flowing into the watercourse. (R. Item 97 pg. 80-81 lines 3426-3450).
c., d., e.) Third Reason, Fourth Reason, and Fifth Reason:
The third reason relating to a less intensive development in terms of fewer lots thereby reducing the amount of impervious surface, and the fourth reason that a less intensive development would reduce the amount of storm water runoff which might result in a smaller size or need for the detention basins which are located within 100' of wetland areas, and the Fifth reason that the use of an arch culvert or a bridge as opposed to the open-bottom box-culvert resulting in less fill and in better facilitating wildlife travel are likewise supported by the evidence listed in support of the First reason. For sake of brevity, the numerous other items of testimony related to this issue are not referenced, but are replete throughout the documentary and transcript record.
Other evidence, although extensive, for the sake of brevity, is briefly summarized as follows: (R. Item 14 pg. 2 Para. C5 areas not flagged as wetlands have seasonal high water that could pose a problem; R. Item 27, Report on sensitivity of area and CT Page 9380 wildlife including rare species such as great egret by Wetlands Scientist Ed Pawlak; R. Item 34 petitions expressing concern in increase in sediment and nutrient loadings to wetlands and Bantam River; DEP and Bureau of Water Management Guide for Inland Wetlands Commission, last page; R. Item 61, arch culvert appropriate for wildlife passage, bridged crossing appropriate to protect riparian values; R. Item 45 pg. 39 mitigation measures to protect stream and riparian resources include "buffer strips, controlling storm water, erosion and sediment, planning well and septic system placement and crossing streams with care"; R. Item 44 ten reasons to provide wildlife corridors R. Item 46 pg. 2 Streambelt protection important for ecology and quantity and quality of water supply; R. Items 52, 53, 54, and 55, 79 letters from neighbors with knowledge of wetland areas and sensitivity of site; R. Item 66 photographs showing wet nature of site; R.97 Transcript pg. 36 lines 1539-1546; Red Maple swamp on site).
The foregoing brief recital of evidence in the record provides substantial evidence supporting the denial and the Plaintiff has failed to meet his burden of proof that the decision is not supported by substantial evidence and that it is arbitrary, unreasonable and an abuse of discretion.
"The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given." Huck v. Inland Wetlands Watercourses Agency,203 Conn. 525, 539-40. The test is "substantial evidence" which "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. FederalMaritime Commission, 383 U.S. 607, 86 S.Ct. 1018, 162.Ed.2d 131 (1966)." Huck, supra at 541-42.
Further, "an administrative agency is not required to believe any witness, even an expert, not is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing, is fundamentally fair." Huck, supra at 542, citing Manor Development Corporation v.Conservation Commission, 180 Conn. 692, 697. Although the Plaintiffs through counsel, an engineer and soil scientist presented an application, then modified it by deleting one lot, changing the location of the detention ponds from inside the wetlands to within 100' of wetlands, and changing the closed box culvert to an open box culvert, an excamination of the record and CT Page 9381 particularly those items relating to stream crossing, detention ponds and less intensive development leading to less storm runoff discloses that there is substantial evidence to support each of the reasons. If only one reason were supported, that would be sufficient. Huck, supra, engaged in extended and close questioning of the Plaintiffs, experts, their counsel and neighbors in opposition. "Knowledge obtained through personal observations of the locus may properly be considered." Huck, supra at 547.
There are factual similarities between this case and Huck. InHuck, the agency was concerned about the number of bedrooms and baths. The Supreme Court, in reversing the trial court and upholding the agency stated, "This seems quite appropriate given the nature of the septic system as proposed and discussed,-".Huck, supra at 544.
In this case, we have a wetlands stream crossing directly in wetlands, and two detention ponds with three catch basins and Lots 1, 9, 10, 11, 12, 13 and 14 all with septic systems or footing drain outlets or driveways or combinations thereof within 100' of wetlands, a regulated area. (R. Items 93 and 94 pg. 9).
The Plaintiff argues that regardless of the testimony on the record, the Commission lacked jurisdiction to deny the application based on its finding regarding impervious surfaces and forest fragmentation. In so arguing, the Plaintiff correctly points out that "Regulated Activity" under Section 2.1 of the regulations does not include reducing development in unregulated areas. (Plaintiff's Brief pg. 19).
But the Plaintiff concedes that a regulated activity does include "any operation or use of a wetland or watercourse, removal or deposition of materials, or any obstruction, construction, alteration or pollution of such wetlands or watercourses, and any earthmoving, filling, construction, or clear cutting of trees within one hundred (100) feet of wetlands." (Plaintiff's Brief pg. 19; R. Item 98 pg. 4).
The Plaintiff further concedes that the most significant activities, all of which were stated in the Commission's findings, related to (1) the crossing of the wetlands and stream by the proposed road. (2) the installation of septic systems within 100 feet of wetlands and (3) the creation of two detention ponds within 100 feet of wetlands. The proposed road CT Page 9382 goes directly through the wetlands and crosses a stream. Extensive testimony by the Plaintiff's experts and the interveners experts was directly on the point of the stream crossing, the box culvert versus arch or bridge crossing, and the effect of the imperious paved road on the wetlands and stream water quality and the resulting impact on fish and wildlife.
Even if the Plaintiff is correct that forest fragmentation is not a wetlands issue, the other significant activities listed above have a direct and significant impact on the wetlands, and that is what the Commission also found. At most, the forest fragmentation issue is superfluous and irrelevant.
Furthermore, the regulations define "Significant Activity" as any activity "which may have a major effect or significant impact on the area for which an application has been filed" and then references (1) "deposition or removal of material. (2) Any activity which — may inhibit the natural dynamics of a watercourse system or (3) Any activity which substantially diminishes the natural capacity of an inland wetland to support desirable fisheries, wildlife or other biological life." The evidence cited in support of the commission's reasons for denial in Paragraph IIIA above, provides substantial evidence that such significant activities were going to occur on or within 100 feet of the wetlands and stream, and it is within the province of the commission. the trier of fact, to make that determination.
The box culvert stream crossing, road size and surface. and detention ponds within the regulated areas are not activities in outlying properties as the Plaintiff's argues, (Plaintiff's Brief pg. 20) but significant activities in a regulated wetland or within 100 feet of the wetland, also a regulated area.
The Commission is the fact finder and has the sole responsibility for weighing the credibility of witnesses. SeeSamperi v. Inland Wetlands Agency, 226 Conn. 579, 588. The Plaintiff's own expert Dennis McMorrow admitted a direct impact on the wetlands and stream, (R. Item 97 Transcript pg. 3 line 106) and it is up to the Commission, based on the entire evidence, which included at a minimum extensive testimony by wetland scientist Pawlak, Engineer Daly and Attorney Grimes, to weigh the credibility of the testimony and make the findings of significant impact, which it did, finding "the proposed activities to constitute a significant activity." (R. Item 94 pg. 1 Motion To Deny Application; R. Item 95 pg. 2 Notice to Richard CT Page 9383 mute of Decision).
The Defendant submits that the significant activities within wetlands and the impact on wetlands and the regulated area within 100 feet of the wetlands are the basis for the Commission's decision, which is well within its jurisdiction, and that the Plaintiffs claim that the findings and decisions were based on reducing development in unregulated areas is not supported by the record.
The Plaintiffs final argument is that "The Commission could not deny the plan based on its Feasible and Prudent Alternative Finding." (Plaintiff's Brief pg. 27).
This argument is predicted solely on the Plaintiff's s claim that there is no impact on the wetlands and this argument must fail if there is an impact on the wetlands.
The evidence in the record previously cited shows a stream crossing by open box culvert which can have a direct impact on the fish and wildlife using the stream. (R. Item 97 Transcript pg. 109, lines 4666-4670).
Since the application as modified had an impact on wetlands, the application should be measured against the feasible and prudent alternative requirements of CGS Section 22a-41 (b) which states "a permit shall not be issued unless the commissioner finds that a feasible and prudent alterative does not exist." That statutory section is mirrored in the Litchfield Wetland Regulations Section 10.3(a). (R. Item 98 pg. 15). "Feasible' means able to be constructed or implemented consistent with sound engineering principles."-"Prudent' means economically and otherwise reasonable in light of the social benefits to be derived from the proposed regulated activity provided cost may be considered in deciding what is prudent and further provided a mere showing of expense will not necessarily mean an alterative is imprudent." CGS Sec. 22a-38.
It is up to the applicant to demonstrate that no such alternative exists. The burden of proof concerning feasible and prudent alterative lies with the Plaintiff's applicant. Huck v.Inland Wetland Watercourses agency, 207 Conn. 525, 553; Hoffmanv. Inland Commission, 28 Conn. App. 262, 265, Ferrer v.Litchfield Conservation Commission, Litchfield Superior court, CV 059884, pg. 9, (Pickett, J., February 11, 1993). CT Page 9384
ln this case not only was the burden on the Plaintiff's to demonstrate that no feasible and prudent alterative existed, but the Commission had before it plans and testimony depicting a feasible and prudent alterative presented by Mr. Organschi and Engineer Tom Daly and wetlands scientist Pawlak. Mr. Pawlak stated in support of this alterative for the passage of finfish, "the better choice is either the precast arch culvert or bridge. — There may also be an advantage in that you could reduce the amount of fill that's required above the structure. However, about 8 feet of will would have to be placed above the box culvert in order to establish the grade for that road crossing, that's a lot of fill material and during construction before soils are vegetated and stabilized that soil is susceptible to erosion for a large storm event which could all end up downstream in the stream so to the extent that you could minimize the amount of fill this placed above the crossing structure you reduce the risk-" (R. Item 97 Transcript pg. 110, lines 4689-4702. Item 65). There was no testimony that such an arch culvert or bridge culvert could not be constructed or implemented consistent with sound engineering principles which is the statutory test that the Plaintiff must meet to satisfy his burden that this alterative or any other alternative is not feasible. In addition. Plaintiff made no showing that the alternating arch culvert or bridge culvert was not environmentally or otherwise reasonable in light of the finfish and wildlife passage which Mr. Pawlak testified would be enhanced by such a stream crossing. Other evidence supporting the six lot alterative as feasible and prudent is found at R. Item 97 Transcript pg. 69 lines 2956-2967.
The Plaintiff's only response to this feasible and prudent alterative is Engineer McMorrow's rebuttal which claimed that the 6 lot subdivision with common driveway would have about the same impact on actual wetlands (R. Item 97 Transcript pg. 161 lines 6884-6885). This rebuttal certainly does not detract from the Commission's findings that at least one feasible and prudent alterative exists, because that particular alterative of 6 lots, instead of 14, presented 8 less driveways, 8 less septic systems, and a 1200 foot long, 18' wide pervious gravel driveway surface instead of an 2450 foot long and 22 foot wide impervious paved public road surface.
This common driveway alterative can be constructed consistent with sound engineering principles, which is the definition of CT Page 9385 "feasible". The plaintiff presented no evidence that the common driveway was not consistent with sound engineering principles. And the common driveway alterative for a 6 lot subdivision permitted by zoning is prudent because of its substantially lower costs of construction partially balance the decrease in number of lots, which is an economically reasonable outcome in light of the numerous social benefits (less runoff, less pollutants, preservation of finfish and wildlife habitat and travel corridors). Under the circumstances, the Plaintiff applicant has not met his burden of demonstrating that there is no feasible and prudent alterative. Huck v. Inland Wetlands and WatercoursesAgency, 207 Conn. 525, 553; Hoffman v. Inland WetlandsCommission, 28 Conn. App. 262, 265; Ferrer v. Town of LitchfieldConservation Commission, supra, (R. Item 38).
For all of the foregoing reasons, the Plaintiffs' appeal is dismissed and the decision of the Commission upheld.
BY THE COURT
HON. WALTER M. PICKETT, JR. JUDGE TRIAL REFEREE